## COMMONWEALTH *vs.* EDWARD L. MAHAN, THIRD.

Suffolk.  October 16, 1984. — November 6, 1984.

Present: GREANEY, C.J., DREBEN, & FINE, JJ.

*Evidence,* Other offense, Impeachment of credibility. *Practice, Criminal,* Assistance of counsel, Fair trial. *Error,* Harmless.

At the trial of indictments charging armed robbery there was no error in admitting evidence that on the day after the robbery the defendant and a companion were arrested on firearms charges as they were sitting in an automobile in which a handgun similar to one used in the robbery was found, and that the defendant was subsequently acquitted on the firearms charge; although there was error in the admission of evidence that the defendant's companion had been convicted on the firearms charge, in light of the judge's immediate curative instructions to the jury, the error was harmless. [739-742]

At the trial of an armed robbery case, it was proper for the prosecutor to attempt to impeach the testimony of two alibi witnesses by their failure to offer their exculpatory information to Commonwealth representatives prior to trial, where, on the evidence and permissible inferences to be drawn therefrom, the jury could have concluded that it would have been natural for the witnesses to furnish their information to the authorities. [742-744]

On appeal from convictions of armed robbery, there was no merit to the defendant's contention that he had been denied the effective assistance of counsel due to his trial counsel's failure to object to certain evidence and counsel's pursuit of "misconceived strategies and tactics." [745-747]

INDICTMENTS found and returned in the Superior Court Department on February 2, 1982.

The cases were tried before *James P. Donohue, J.*

*Bruce Ferg* for the defendant.

*Judy G. Zeprun,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. Mahan was convicted by a Superior Court jury on two indictments charging him with armed robbery and sentenced to concurrent terms of imprisonment. Represented

by new counsel on appeal, Mahan asserts: (1) that evidence of other bad acts and crimes committed by him and his code-fendant (Dennis Saulnier) was improperly admitted, (2) that the prosecutor's cross-examination and closing argument concerning the failure of his alibi witnesses to advise the police of their information deprived him of a fair trial, and (3) that his trial counsel furnished him with ineffective assistance.

Background facts before the jury were as follows. At approximately 5:30 P.M. on November 6, 1981, the owner, a sales-clerk, and a customer of a small clothing store on Charles Street in Boston were robbed by two white males, one of whom was armed with a handgun. The victims gave descriptions of the robbers to the police. The owner and salesclerk looked through photographic arrays presented the same night by the police but were unable to make any identification. (The arrays did not contain any photographs of Mahan or Saulnier.)

On November 7, 1981, the day after the robbery, the attention of Detective Gleason of the Boston police was drawn to a station wagon parked in an MBTA parking lot in Charlestown. As Gleason approached the passenger side of the vehicle, he observed a handgun protruding from beneath a cloth in the rear seat. The gun (a .38 automatic pistol) was seized, along with a knife, a credit card, and a bag. The vehicle's occupants, Mahan and Saulnier, were placed under arrest and both were later charged with unlawful possession of the firearm. The handgun was immediately brought to Boston and shown by the police to the owner and salesclerk, who identified it as "like the same gun" used in the robbery.

The arrest of Mahan and Saulnier also provided the police with photographs of the two men which had theretofore been unavailable for viewing by the victims. New arrays were assembled containing these photographs. About one week later, the new arrays were shown to both the owner and the salesclerk, who identified Mahan and Saulnier as the robbers.

1. With this background, we summarize the events relevant to the first claim of error. At trial, Detective Gleason testified about the circumstances leading to the seizure of the handgun and the arrest of Mahan and Saulnier. This testimony was fur-

nished over an objection by Mahan's trial counsel which concerned itself primarily with the evidence of the handgun. (In the interim, between its seizure and the trial, the handgun had been lost.) Mahan's trial counsel argued that, since the handgun was not available, any testimony concerning it was inadmissible. In response to the objection, the prosecutor argued that the circumstances of the arrest, and the seizure and identification of the handgun, were relevant to the identification of Mahan and Saulnier as the robbers and could permissibly be brought to the jury's attention even if the handgun was not available. Mahan's trial counsel indicated that if the prosecutor was permitted to place Mahan "in the car with the gun [then he, Mahan's counsel, was] going to bring to the jury's attention that [Mahan] was tried and acquitted on the gun charge." The judge ruled that the prosecutor would be permitted to inquire about the seizure and identification of the handgun and, if he did, that Mahan's trial counsel could bring out the fact of Mahan's acquittal.

The direct and cross-examinations proceeded in accordance with this ruling, and the jury were duly informed of Mahan's acquittal on the firearm charge. On redirect examination, however, the prosecutor obtained testimony from Detective Gleason that Saulnier had been convicted on the firearm charge. Mahan's counsel objected. Without prodding, the judge gave an immediate and direct instruction to the jury which brought home the following points: (1) any charges brought in connection with the arrest of Mahan and Saulnier on November 7 were irrelevant to the robbery indictments then being tried, (2) the jury were to be concerned solely with the robbery charges before them, and (3) the evidence pertaining to the handgun was relevant only on the question whether it was the same handgun used in the robbery.

Mahan argues that he suffered prejudice because the testimony pertaining to his arrest with Saulnier on November 7, the seizure of the handgun, and Saulnier's conviction on the firearm charge constituted improper proof of bad acts and other crimes which were unrelated to the offenses being tried.

The judge properly admitted the evidence concerning the arrest of the two men and the seizure of the handgun. This evidence was circumstantially probative to identify Mahan and Saulnier as the perpetrators by showing (through the victims' testimony): (1) that the two men fit the descriptions of the robbers furnished by the victims, and (2) that the handgun, found in a vehicle occupied by both men, was similar to the weapon used in the robbery. In addition to linking Mahan and Saulnier with each other and with a weapon which could have been used in the commission of the crimes, the evidence also tended to explain why two of the victims could not make identifications from the photographic arrays shown to them immediately after the robbery, but could do so shortly thereafter. The evidence was thus more than an effort by the prosecutor to interject into the trial — under the guise of giving the jury "a complete picture," see *Commonwealth* v. *Brown,* 389 Mass. 382, 385 (1983) — evidence of unrelated bad acts. " '[E]vidence of other [bad acts] is admissible when substantially relevant to the offense charged; inadmissible when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it . . . .' " *Commonwealth* v. *Deschamps,* 1 Mass. App. Ct. 1, 3 (1972), and cases cited. "A judge has broad discretion in determining whether the probative value of evidence of other [bad acts] outweighs the prejudicial effect of that evidence." *Commonwealth* v. *Lovell,* 6 Mass. App. Ct. 172, 177 (1978). See *Commonwealth* v. *Burke,* 339 Mass. 521, 534 (1959). We are satisfied that the judge could have properly decided that the evidence of Mahan's arrest and the seizure of the handgun was admissible. See *Commonwealth* v. *Lovell,* 6 Mass. App. Ct. 172, 177 (1978).[1] Cf. *Commonwealth* v. *Madyun,* 17 Mass. App. Ct. 965 (1983).

---

[1] Mahan's argument that the judge never expressly indicated, in ruling on admissibility, that the probative value of the evidence outweighed any prejudice does not require that the evidence be excluded. Such a determination is implicit in the judge's consideration of the tender of, and the objection to, the evidence and the judge's ultimate decision to admit it.

With the evidence of the seizure and identification of the handgun in the case, it was proper for the judge to allow Mahan's trial counsel, as a matter of fairness, to introduce the fact that Mahan had been acquitted on the handgun charge. We fail to see how Mahan could have been prejudiced by this evidence. Its introduction probably reflected a tactical choice by trial counsel which, if anything, would have dispelled from the jurors' minds speculation about Mahan's culpability in connection with his arrest for possession of the firearm. See *Commonwealth* v. *Williams,* 379 Mass. 600, 606 (1980).

The testimony that Saulnier had been convicted on the firearm charge presents a different problem. That testimony was improper and should have been excluded. There was objection to receipt of the evidence, however, by Mahan's trial counsel and the chance for inflammation of the jury was cured by strong instructions given by the judge on the spot. These instructions put the whole matter of collateral bad acts in perspective and, in our view, were sufficient to correct any adverse impression created by the testimony that Saulnier had been convicted on the firearm charge.[2] We conclude that Mahan was not subjected to an unfair trial by reason of improper evidence of involvement in other bad acts and crimes.[3]

2. Mahan presented evidence of alibi through two witnesses, William Kelly and "Debbie" Fitzgerald. Kelly testified that he

---

[2] The instructions also tended to erase any advantage Mahan might have gained from the jury's knowledge that he had been acquitted on the firearm charge. The important point, however, is that the instructions set the jury straight on the relevance of the handgun and advised them to disregard, as irrelevant, the charges stemming from the November 7 arrest.

[3] The seizure of the other items from the vehicle on November 7 assumed no major importance at the trial and, in our view, testimony about the seizure of these objects could not have prejudiced Mahan. The other evidence questioned by Mahan concerns testimony which identified the stolen vehicle used in the robbery. This evidence was properly admitted to counter the notion interjected by Mahan's trial counsel that the owner of that vehicle might have been the robber. The prosecution made no attempt to show that Mahan had stolen the vehicle. Finally, Officer Gleason had earlier testified that he was not certain whether Saulnier was found guilty or innocent of the larceny of the motor vehicle. The prejudicial effect of this ambiguous testimony was countered by the judge's instructions on collateral offenses.

had worked with Mahan as a longshoreman on the day of the robbery, that he had punched out of work about 5:00 P.M., and that Mahan had given him a ride home. Fitzgerald testified that on November 6, during the time of the commission of the robberies, Mahan had assisted her in repairing a flat tire.

The prosecutor's cross-examination of Kelly brought out that he had known Mahan all his life and that, around the time of the incident, they were social friends. It was further disclosed that Kelly had known for some time that Mahan was in trouble with the law and that his (Kelly's) information was "fairly important." Kelly was also aware of the identities of the investigating police officer and prosecutor but made no effort to disclose his information to either.

Cross-examination of Fitzgerald brought out much the same thing: close friendship with Mahan, some knowledge of the pending charges, her knowledge that she possessed important information, and a failure on her part to speak to the police. Fitzgerald also admitted a willingness to assist Mahan since he had helped her with her vehicle on November 6. In both instances, the witnesses had conveyed their information to Mahan's trial counsel (Fitzgerald stating that she had sought out defense counsel with her alibi evidence on her own after Mahan had approached her about their whereabouts on November 6). There was no indication that either Mahan's trial counsel or Mahan had instructed either witness not to make his or her information known to the authorities. With this testimony in hand, the prosecutor in his summation argued, without objection, that Kelly's and Fitzgerald's pretrial silence shed doubt on the reliability of their alibi testimony.

The thrust of the prosecutor's questioning and argument was to suggest that Kelly and Fitzgerald "had prior opportunity to tell their stories to Commonwealth representatives and did not do so. This [could be] a proper mode of impeaching these witnesses by showing recent contrivance or bias in favor of the defendant," *Commonwealth* v. *Cefalo,* 381 Mass. 319, 338 (1980), provided a foundation is first laid. The foundation requirements for such impeachment evidence are set forth in *Commonwealth* v. *Brown,* 11 Mass. App. Ct. 288, 296-297

(1981).[4]  See also *Commonwealth* v. *Berth,* 385 Mass. 784, 790-791 (1982); *Commonwealth* v. *Hesketh,* 386 Mass. 153, 162-164 (1982).

Contrary to Mahan's assertions, we think the appropriate foundation was secured in this case.[5]  From conversations with Mahan and other sources, both alibi witnesses knew or should have known that November 6 was a date critical to Mahan's defense of serious charges. They had ample reason, as close friends of Mahan, to make their information available. There were open lines of communication between the witnesses and Mahan and his counsel, and there was no evidence of instructions which would have caused the witnesses to refrain from making their information known. The facts of this case closely resemble those in *Hesketh, supra,* where the prosecutor built her foundation by demonstrating that the witnesses "had reason to recognize that [they] possessed exculpatory information [and] had a reasonable motive for acting to exonerate the defendant." *Commonwealth* v. *Hesketh,* 386 Mass. at 163, quoting from *People* v. *Dawson,* 50 N.Y.2d 311, 321 n.4 (1980). The prosecutor's questioning and argument were proper because, on the evidence and permissible inferences to be drawn therefrom, the jury could have concluded that it would have been natural for Kelly and Fitzgerald to go to the police and tell them that Mahan could not have committed the robberies.[6]

---

[4] The foundation requires that the prosecutor establish "that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so." 11 Mass. App. Ct. 296-297.

[5] In order to ensure that the jury are not misled by the prosecutor's efforts to impeach the credibility of an alibi witness' testimony, it may be appropriate in some cases for the trial judge to conduct a voir dire to ascertain that the necessary foundation is present. See *Commonwealth* v. *Nickerson,* 386 Mass. 54, 62 (1982); *Commonwealth* v. *Brown,* 11 Mass. App. Ct. 288, 297 (1981).

[6] Contrary to Mahan's argument on appeal, the judge, in the absence of a request for an instruction, was under no duty to explain the considerations applicable to this type of impeachment testimony by (for example) explaining the *Brown* foundation criteria or the existence of possible reasons which

3. Mahan's last argument asserts that he was denied the effective assistance of counsel due to his trial counsel's failure to object to certain evidence and counsel's pursuit of "misconceived strategies and tactics."

To demonstrate ineffective assistance, a defendant must show both "(1) that the conduct of his trial counsel fell 'measurably below that which might be expected from an ordinary fallible lawyer,'" *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), and (2) that "prejudice result[ed] therefrom," *Commonwealth* v. *Sellon,* 380 Mass. 220, 223 (1980), quoting from *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979). If tactical or strategic judgments are called into question, the defendant must also show that the judgment was "manifestly unreasonable," *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978), which typically means the loss of "an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian, supra.* See also *Strickland* v. *Washington,* 466 U.S. 668, 693-694 (1984). We are satisfied that these showings have not been made on any of the four particular grounds of ineffectiveness claimed.

(a) The question asked by Mahan's trial counsel of an investigating police officer as to why Mahan and Saulnier were considered "suspects" could have been aimed at furthering Mahan's misidentification and alibi evidence by suggesting that the police had made arrests on the basis of general descriptions given by the victims, the presence of the men together, and the discovery of the handgun in the station wagon. It could have been thought that probable cause for Mahan's arrest was thin and that his subsequent identification by the victims (the strongest evidence against him) was more the product of police

would account for an alibi witness' not disclosing his information to the police. Cf. *Commonwealth* v. *Nickerson,* 386 Mass. at 62. We also note that, in his redirect examination of the alibi witnesses, Mahan's trial counsel very forcefully brought out the fact that the police had never talked to them and that one witness did not know the names of the investigating officers. Trial counsel also argued in his summation that the alibi witnesses thought it better to bring their information to him rather than to the police. The lack of jury instructions on the issue did not in any way detract from counsel's trial strategies.

suggestion than independent recollection on the victims' part. Trial counsel's judgment underlying the asking of the question thus appears tactical in nature and not manifestly unreasonable.

(b) We have already indicated in part 2 of this opinion that the prosecutor's cross-examination of the alibi witnesses with respect to their pretrial silence was proper, as was his final argument based on the testimony gleaned from that questioning. We do not think an objection to the inquiry would have gained anything for the defense. Nor do we see, as establishing ineffectiveness, trial counsel's failure to request a voir dire when the cross-examination occurred or to seek final jury instructions spelling out the standards in the *Brown* decision. Based on the testimony given by the alibi witnesses in response to the prosecutor's questions, a voir dire would not have led to the exclusion of the evidence. It is also clear to us that nothing done by trial counsel deprived Mahan of an available substantial ground of defense.

(c) Trial counsel's decision to rely on the judge's curative instructions with respect to the relevancy of the disposition of the firearm charges was reasonable. Trial counsel's apparent choice not to move for a mistrial does not bespeak ineffectiveness. Motions for mistrial, in circumstances like these, are rarely allowed, a fact that trial counsel likely perceived.

(d) The complex arguments now advanced by Mahan's appellate counsel urging that evidence of certain out-of-court identifications of Saulnier and the handgun could have been excluded, as hearsay, if objected to, do not establish ineffectiveness of trial counsel. We think that trial counsel's decision not to object may have been grounded on a reasonable tactical judgment.[7] Counsel may have thought that the stronger evidence against Saulnier might have a tendency to make the case against Mahan look weaker, thereby enhancing the alibi evidence. If the decision was not tactical, given the complicated nature of the objection now proposed, we do not consider that

[7] This conclusion is strengthened by the fact that Mahan's appellate counsel concedes that the prosecutor probably could have surmounted the hearsay problem regarding Saulnier's identification by introducing Saulnier's photograph as an exhibit.

the failure to make objection brought trial counsel's efforts outside the range of reasonable professional assistance. See *Strickland* v. *Washington,* 466 U.S. at 694-695. With particular reference to the identification of the handgun, we see no reasonable likelihood that any such objection would have been sustained.

*Judgments affirmed.*